## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| TCP INTERNATIONAL HOLDINGS, LTD., | ) | |
| and TECHNICAL CONSUMER | ) | |
| PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: |
| | ) | |
| v. | ) | DEMAND FOR JURY TRIAL |
| | ) | |
| ELLIS YAN, SHAWN DU, JOSE ORTIZ, | ) | |
| and QUALITY LIGHT SOURCE LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND DAMAGES

Plaintiffs TCP International Holdings, Ltd. ("TCPI") and Technical Consumer

Products, Inc. ("TCP Inc.") (collectively "TCP" or the "Company") by and through their

undersigned counsel, for their Verified Complaint for Temporary Restraining Order, Preliminary

and Permanent Injunctive Relief, and Damages against Defendants Ellis Yan, Shawn Du, Jose

Ortiz, and Quality Light Source LLC ("QLS," and together with Ellis Yan, Shawn Du, and Jose

Ortiz, the "Defendants"), state as follows:[1]

## I.    NATURE OF THE ACTION

1.     This is a civil action for unfair competition based on Defendants' attempt to

exploit and trade upon the goodwill and reputation of TCP and unfairly compete with TCP in the

energy efficient lighting industry by passing off TCP's product offerings, infrastructure,

---

[1]    Upon filing this Verified Complaint and Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, and Memorandum of Law in Support thereof, Plaintiffs will email copies of the foregoing pleadings and all related filings to the following: Judy Woods, whom Plaintiffs believe is litigation counsel for Defendant Ellis Yan; Ira Kaplan, the registered agent for Defendant QLS; and Defendants Shawn Du and Jose Ortiz at email addresses Plaintiffs believe belong to Du and Ortiz.

manufacturing capabilities, and even TCP's products as those of QLS.  Plaintiffs also bring claims for breach of contract and tortious interference to prevent TCP's former CEO and Chairman, Ellis Yan, and former leading salesman, Jose Ortiz, from associating in any manner with QLS and its affiliates during the period of times that each is subject to restrictive covenants in his respective employment agreement with TCP, Inc.

2.     Plaintiffs seek temporary, preliminary, and permanent injunctive relief to protect TCP from reputational harm and loss of customers caused by Defendants QLS, Shawn Du, and Ellis Yan's engagement in unfair competition and deceptive trade practices and to protect the public from confusion regarding the capabilities of QLS and the origin of products allegedly available for sale from QLS.

3.     Plaintiffs also seek a temporary restraining order and preliminary and permanent injunctive relief against Defendant Ortiz to restrain him from associating with QLS until the expiration of the valid and binding one-year covenant not to compete in his employment agreement with TCP, Inc., and further seek compensatory and punitive damages against Defendants QLS and Yan based on their tortious interference with Ortiz's contractual obligations to TCP, Inc.

4.     Finally, Plaintiffs seek a temporary restraining order and preliminary injunction against Defendant Ellis Yan to restrain him from further violating the restrictive covenants set forth in his Executive Employment Agreement with TCP, Inc., which prohibit him until July 1, 2017, from competing with Plaintiffs or soliciting Plaintiffs' employees, and prohibit him permanently from the unauthorized disclosure or use of Plaintiffs' confidential and proprietary information.  Because the underlying breach of contract claims against Defendant Yan are subject to mandatory arbitration, TCP is filing a separate arbitration action against Defendant

Ellis Yan based on breaches of those contractual obligations. Injunctive relief in this action is necessary to preserve the status quo pending appointment of an arbitrator and the ability to obtain relief in that forum.

## II.    INTRODUCTION

5.      The actions that give rise to this Complaint constitute an unfortunate development in what has become a tumultuous relationship between TCP and Defendant Ellis Yan, TCP's founder and largest shareholder and former Chairman and CEO, since shortly after he and his brother, Solomon Yan, took the Company public in June 2014.  Following an Audit Committee investigation initiated in December 2014, and a finding that Defendant Ellis Yan's management style and improper tone at the top had resulted in a material weakness in internal controls over financial reporting, Defendant Yan agreed to step down from his position as CEO of TCP effective June 30, 2015, for a period of at least one year.

6.      Although Defendant Yan continued in his role of Chairman of TCP's Board of Directors, the terms of a Mutual Separation Agreement, including those that confined his ability to contact employees, customers, and vendors, restricted his power to control and act on behalf of the Company.

7.      Defendant Yan's ability to regain his prior position as CEO was further complicated after the Audit Committee initiated a second investigation in September 2015, into the scope and propriety of undisclosed business-related payments that Defendant Yan made with his personal funds and the existence of undisclosed relationships between Ellis Yan or his brother Solomon Yan and certain of TCP's vendors.

8.      The Audit Committee's findings in the second investigation reinforced the need for comprehensive restrictions on the ability of Defendant Yan and his brother Solomon Yan to be involved in day to day management of TCP or otherwise control its actions through their

3

majority voting power. Without the Yan brothers' agreements to curtail their involvement, TCP would be unable to remedy the material weakness in internal controls that their misconduct caused.

9.      For several months beginning in mid-2016, the independent directors of TCPI attempted in good faith to negotiate acceptable remedial measures with the Yan brothers. Defendant Yan refused, however, to agree to the independent directors' proposals, instead insisting that his direct involvement and control of the Company was essential to its success.

10.     TCP has now learned, through reports from customers and investigation, that once Defendant Yan realized that the independent directors would not permit him to return to management with carte blanche authority, he set out on a path to unfairly compete with TCP by misappropriating and using TCP's confidential information to start a competing company – Quality Light Source LLC ("QLS") – and by passing off TCP's product offerings, infrastructure, manufacturing capabilities, and even TCP's products as those of QLS.

11.     Defendant Ellis Yan did not do this by himself.  Instead, apparently recognizing that he is contractually obligated under a valid non-compete that bars him from any association with a competing company, he engaged others, including his brother Solomon Yan, a Chinese resident, and Shawn Du, a friend and former business associate, to set up shop for him, promising he would formally join QLS in July 2017, when his non-compete expires.  But Ellis Yan's efforts to hide his involvement behind his agents are transparent.

12.     The Court must immediately stop Defendant Yan's calculated and on-going attempts to unfairly compete with TCP through QLS and with the help of Defendant Du and others.  Without immediate court intervention, the Company will suffer irreparable harm, including harm to its business reputation and goodwill and the potential loss of customers.

4

Moreover, the public will continue to be misled by QLS's deceptive tactics and willful and deliberate passing off of TCP's product offerings, infrastructure, manufacturing capabilities, and even TCP's own products as those of QLS.

## III.  JURISDICTION AND VENUE FOR ALL CLAIMS

13.  This Court has jurisdiction over Plaintiffs' Lanham Act claim for unfair competition pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331.

14.  The Court has jurisdiction over Plaintiffs' claims for unfair competition under the Ohio Deceptive Trade Practices Act, Ohio Rev. Code §§4165.01 *et seq*., and Ohio common law, for tortious interference against Defendants QLS and Yan, and for breach of contract against Defendant Ortiz, pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

15.  The Court has jurisdiction to issue a temporary restraining order and preliminary injunction to restrain Ellis Yan from breaching the restrictive covenants and confidentiality provision in his Executive Employment Agreement pursuant to 9 U.S.C § 3.

16.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) because a substantial part of the events giving rise to the claims alleged herein occurred in and continue to occur in this district.

## IV.  THE PARTIES

17.  Plaintiff TCP International Holdings, Ltd. is a Swiss corporation with its principal executive offices located at Alte Steinhauserstrasse 1, 6330 Cham, Switzerland.  TCPI also maintains an office at 325 Campus Drive, Aurora, Ohio 44202.

18.  Plaintiff Technical Consumer Products, Inc. is a wholly-owned subsidiary of TCP International Holdings, Ltd., with its offices located at 325 Campus Drive, Aurora, Ohio 44202.

19.    Defendant Ellis Yan resides in Ohio.  He is the founder, largest shareholder, and former Chief Executive Officer and Chairman of TCP International Holdings, Ltd.  He is also a former director and Chief Executive Officer of TCP, Inc.

20.    Defendant Shawn Du resides in Michigan and is a partner at Quality Light Source LLC.

21.    Defendant Jose Ortiz resides in Parma, Ohio and is a former employee of TCP, Inc.  Upon information and belief, Ortiz is now employed by Defendant QLS.

22.    Defendant Quality Light Source LLC is a company newly-formed in Cleveland, Ohio, which purports to be an original equipment manufacturer and design manufacturer of lighting products.

## V.    FACTUAL ALLEGATIONS

### A.    TCP's Business and Relationship with Defendant Yan

23.    Brothers Ellis and Solomon Yan founded TCP in 1993.   For two decades, Ellis and Solomon Yan operated TCP as a private company, with Ellis acting as CEO, charged with global operations and sales in the United States, and Solomon acting as President, charged with oversight of the manufacturing facilities in China.

24.    TCP completed an initial public offering ("IPO") on June 25, 2014, offering 7,142,858 shares at $11.00 per share for trading on the New York Stock Exchange.

25.    Following the IPO, Ellis Yan remained the company's largest shareholder. Together with his brother Solomon, and two Yan family trusts, the Yans maintained control of approximately 74% of the company's stock. They also were parties to a shareholder agreement, which mandated that each of them vote their shares to elect as board members, Ellis Yan or his designee, Solomon Yan or his designee, all other persons proposed as directors by Ellis Yan. This effectively allowed Ellis Yan to have all actual control of the Board.

26.     At the time of the IPO, Ellis Yan was named Chairman of the Board of TCPI and Solomon Yan was named Vice Chairman of the Board.  Ellis Yan maintained his position as Chief Executive Officer of TCP, Inc., and Solomon Yan maintained his position as President.

27.     Today, TCP is a leading global provider of energy efficient light-emitting diode ("LED") and compact fluorescent lighting ("CFL") technologies.  Together with its subsidiaries, TCP designs, develops, manufactures, and delivers energy efficient lamps, fixtures, and Internet-based lighting control solutions.

28.     TCP offers a broad portfolio of advanced LED and CFL lamps and fixtures, including a large number of Energy Star® compliant lighting products, through thousands of retail outlets and directly to commercial and industrial ("C&I") customers primarily in the United States and Canada.  Since TCP's inception, it has sold more than one billion energy efficient lighting products.

29.     TCP operates product development facilities in Aurora, Ohio and China focused on introducing new technologies, increasing functionality, enhancing quality, improving manufacturing processes, and reducing costs.

30.     The Company owns four manufacturing facilities located in close proximity to Shanghai, China.  With over 2 million square feet of manufacturing space, the TCP factories have the capacity to manufacture hundreds of thousands of lamps every day.

31.     TCP also owns a number of lighting laboratories around the world, including a number of in-house testing facilities in Ohio and China, as well as an accredited laboratory for Underwriters Laboratory and Energy Star® testing in Aurora, Ohio, and a testing laboratory, the Aurora International Testing Laboratory ("AITL"), in Shanghai, China.

**B.      Post-IPO Events Lead to Defendant Yan's Removal from TCP Management**

32.      Just six months after TCP's initial public offering, in December 2014, TCP's Audit Committee initiated an investigation into allegations related to the management approach and conduct of Ellis Yan, the Company's then-CEO.  *See* TCPI Form 10-K, filed April 15, 2015, at 31-32.

33.      In the midst of the investigation, on February 26, 2015, the former General Counsel of TCP, Laura Hauser, filed litigation against Defendant Yan and TCP, Inc. (under a theory of respondeat superior), alleging that Yan had engaged in unlawful behavior, including by threatening and intimidating her during the course of her employment as the General Counsel and Secretary of the Company (the "Hauser Action").  *Id.* at 31.

34.      Allegations from the Hauser Action sparked a number of federal securities class action lawsuits, which were consolidated before Judge Dan Aaron Polster in *Sohal v. Yan,* Case No. 1:15-cv-00393-DAP (N.D. Ohio), as well as a state securities class action, and an investigation by the U.S. Securities and Exchange Commission.  *See, e.g.,* TCP Form 10-Q, filed August 7, 2015, at 8-9.

35.      At the conclusion of the Audit Committee's investigation, the Committee determined that structural and management circumstances at the Company, generally centered on Defendant Yan's ubiquitous and highly personalized approach to running the Company, needed to be rectified.  TCP also disclosed that it had identified a related material weakness in its internal control over financial reporting.  The Company stated:

> [Ellis Yan's] actions were inconsistent with setting an appropriate tone at the top by failing to adhere to the Company's established policies and procedures. Our Chief Executive Officer bypassed reporting lines established to enable the execution of authorities and responsibilities, which facilitate the flow of information to manage the activities of the Company and ensures that financial reporting matters could be adequately evaluated in a timely manner.

8

TCPI Form 10-K, filed April 15, 2015, at 78.

36.     As a result of the Audit Committee's findings and identification of the material weakness, TCP Inc. and Defendant Yan agreed that they would not renew his employment agreement as CEO, which was set to expire on June 30, 2015.  The parties agreed that Defendant Yan would nonetheless remain a director of TCP and serve as the Chairman of the Board.  *Id.* at 32; 78-79.

37.     The parties entered into a Mutual Separation Agreement to govern the permissible terms of Defendant Yan's involvement in TCP during his separation.  Among other things, the parties agreed that Yan would not engage in contact or communications with employees, customers, and business relationships of the Company and its affiliates in any matters concerning, and that interfered with, the business or affairs of the Company, unless (a) requested by the executive then serving as CEO of TCP or the board of TCP, or (b) upon explicit advice of counsel that, in the particular circumstance, the contact or communication was necessary in the discharge of his fiduciary obligation as a director.  *See* Mutual Separation Agreement, attached as Exhibit 10.5 to TCPI Form 10-k, filed April 15, 2015.

38.     Approximately five months later, in September 2015, TCP initiated a second Audit Committee investigation related to Defendant Ellis Yan.  This time, the Board charged the Audit Committee with investigating the scope and propriety of business-related payments made by Defendant Yan with his personal funds and determining whether undisclosed relationships existed between Ellis Yan or his brother Solomon Yan and certain of TCP's vendors.  As a result of the investigation, TCP disclosed that it would not be able to timely file its Form 10-Q for the period ending September 30, 2015.  *See* TCPI Form 8-K, filed Nov. 5, 2015.

39.     This sparked a second round of securities class action litigation, now pending before Judge Donald C. Nugent in *Bai v. TCP Int'l Holdings, Ltd., et al.*, Case No. 1:16-cv-00102 (N.D. Ohio).

40.     The Audit Committee investigation lasted more than a year.  Throughout that time period, TCP's management learned on several occasions that Defendant Yan had violated the terms of his Mutual Separation Agreement by repeatedly contacting employees and other persons that had business relations with TCP.

41.     When TCP's management confronted Defendant Yan, he tried to hide his actions, including by having others deliver messages for him and purchasing and making calls on different cell phones so that TCP would not be able to track his activity.

42.     For example, on at least one occasion, a close friend and confidante of Defendant Yan's, Wei Ying Sui, called a TCP employee in sales and left a cryptic message for him to call a certain phone number because "somebody" wanted to talk to him.  When the sales employee called the number, the "somebody" who answered was Defendant Yan.

43.     On October 5, 2016, TCP disclosed that its Audit Committee had concluded its investigation and found, among other things, that:

- The Company's historical financial statements omitted compensation expense received by numerous employees directly from Ellis Yan, which totaled approximately $276,000[2];

- The Company's historical financial statements omitted related party disclosures related to transactions with entities owned or influenced by Solomon Yan; and

- Ellis Yan [had] violated the terms of his Mutual Separation Agreement by contacting or communicating with employees and others in business relationships with the Company.

---

[2]     This amount includes approximately $13,000 that Defendant Ellis Yan paid Defendant Jose Ortiz out of his personal funds during an 18-month period.

TCPI Form 8-K, filed October 5, 2016.

44.     The Audit Committee further concluded that, by failing to adhere to the Company's established policies and procedures, Defendant Ellis Yan and his brother Solomon had continued to fail to set an appropriate tone at the top, resulting in a prolonged material weakness in the effectiveness of the Company's internal control over financial reporting.  *Id.*

45.     Following the conclusion of the investigation, TCP negotiated with the Yan brothers in an effort to reach an agreement regarding remedial actions to address the Company's material weakness.

46.     Defendant Yan and Solomon Yan refused, however, to give up their majority voting control over the Company or to agree to continue to separate themselves from management of the Company.

47.     As a result of the second Audit Committee investigation, its findings, and the necessity of adopting remedial measures to cure the material weakness in internal controls, TCP has been unable to file its mandatory quarterly and annual reports under the federal securities laws since the second quarter of 2015, and its stock has been suspended from trading on the New York Stock Exchange.

48.     At a TCP Board of Directors meeting held on January 31, 2017, Defendant Yan gave a final ultimatum: if the independent directors did not allow him to return to the TCP management team, he would resign from the Board.  After the independent directors refused, Defendant Yan submitted a written notice of resignation later that day, resigning from the Board of Directors of TCP and as director of all affiliates of the Company, effective immediately.

49.     On February 1, 2017, Solomon Yan resigned from the Board of the Company and as director of all affiliates of the Company, effective fourteen days following receipt of the resignation.

50.     TCP subsequently learned that the resignations had been long planned, and that Ellis and Solomon Yan had for months been taking steps both domestically and in China to set up a lighting company to unfairly compete with TCP, using TCP's own proprietary information, product offerings, and even TCP's products, as well as the know-how and customer connections they gained during their tenure at TCP.

**C.      TCP Management Learns About Quality Light Source**

51.     On or around January 27, 2017, just prior to the resignations of Defendant Ellis Yan and his brother Solomon, TCP received notice that Defendant Shawn Du had visited the offices of Customer A to pitch his new company, QLS, as a supplier of lighting to incorporate into Customer A's fixtures.

52.     Customer A was and is a current customer of TCP.

53.     During or shortly following the pitch meeting, Defendant Du provided Customer A with a handout dated January 2017, titled QLS OEM/ODM Product Overview, that purported to provide an overview of QLS, including its alleged design and manufacturing capabilities and product offerings ("QLS Overview" attached as Exhibit A[3]).

54.     An employee of Customer A who received the QLS materials noticed that they appeared to contain a number of statements, images, and representations related to TCP. The employee reached out to TCP and passed along the QLS Overview.

55.     At the time, no one at TCP had ever heard of Quality Light Source or QLS.

---

[3]     The exhibits referenced herein are attached to the Declaration of Charles F. Smith, also filed today.

56.    When TCP management reviewed the QLS Overview, they discovered that QLS is marketing itself by passing off TCP's product offerings, infrastructure, manufacturing capabilities, and marketing materials as its own, or otherwise falsely representing that QLS and TCP are somehow affiliated with each other.

57.    Among other things, the QLS Overview contains a map of China, which allegedly represents the manufacturing facilities of QLS, but actually identifies the locations of TCP's China headquarters and its four manufacturing facilities, each identified by the specific and unique acronym used by TCP to differentiate between facilities (HQL, YQL, ZQL and SQL): *See* QLS Overview, at 3.



58.    The QLS Overview also contains a number of images taken directly from the TCP website, including images of a TCP factory and various product offerings.  The factory image that appears on Page 3 of the QLS Overview is a reproduced imaged from TCP Europe's

website. *Compare* QLS Overview (Exhibit A) at 3 with at www.tcpi.eu/about/facilities:



The filament lamp images appearing on page 9 of the QLS Overview are lifted from TCP's

United States website. *Compare* QLS Overview (Exhibit A) at 9 with http://www.tcpi.com/spec-

sheets/WF9220-LED-Filament-Lamps.pdf:



The product images on pages 13 and 15 of the QLS Overview are also lifted from TCP's website. *Compare* QLS Overview (Exhibit A) at 13 with http://www.tcpi.com/business/products/lamps/led-t8s and QLS Overview (Exhibit A) at 15 with http://www.tcpi.com/business/products, and http://www.tcpi.com/business/products/lamps/elite-series-led-downlights:







59.     The QLS Overview also refers to TCP's wholly-owned and proprietary testing laboratory, the Aurora International Testing Laboratory (AITL), on two separate occasions, representing that the lab is part of QLS's infrastructure.  On page 4 of the QLS Overview, QLS refers to the AITL in its discussion of quality and certification, and on page 5, QLS prints AITL's Certificate of Accreditation:



(Exhibit A at 4-5.)

60.    The QLS Overview also contains an image of a Quality Management System Certificate awarded to Zhenjiang Qiangling Electronic Co Ltd, a manufacturing facility wholly owned by TCP Hong Kong.



17

61.     The QLS Overview also includes pages of product descriptions that match TCP's product specifications, including TCP's internal lab certification numbers and product identifiers. (Exhibit A at 10-12, 14, 17-18.)

62.     TCP also observed that the factory internal image on page 4 of the QLS Overview came directly from a presentation that was prepared at the direction of Ellis Yan and presented in 2013 and in 2014, and that resides on TCP's systems under the file name "Ellis's Slides 12.12.13." (Exhibit B.)

63.     TCP management recognized Du from his prior positions at Nichia America Corporation in Detroit, Michigan, where he led Nichia's LED product commercialization process from 2009 – 2014, and at Seoul Semiconductor, where he held a similar position from 2015 – 2016. Nichia and Seoul Semiconductor each supplied TCP with LED chips during Du's employment with the respective companies, and Du regularly met with Defendant Ellis Yan regarding the TCP account, as well as on a personal level, including by having dinner at Yan's residence.

64.     TCP management also noticed that the QLS materials revealed a focus on filament light bulbs and the C&I sector. Just months earlier, at a TCP Board of Directors meeting in the fall of 2016, Defendant Yan laid out his vision for the future direction of TCP and expressed his strong belief that TCP should focus on filament light bulb technologies and the C&I sector, which are ongoing parts of TCP's business strategy today.

65.     TCP immediately initiated an investigation into QLS and Shawn Du.

**D.     TCP Learns that Defendant Ellis Yan and His Brother Solomon Yan Are Behind QLS**

66.     Following their investigation, Plaintiffs have now learned that Defendant Ellis Yan has been preparing since at least October 2016 to start a lighting company focused on

18

energy efficient products to directly and unfairly compete with TCP.  What is more, Defendant Yan has intentionally misappropriated and used TCP's propriety information and even its products to help in his effort.

67.     Although QLS was not initially registered when Defendant Du first met with Customer A, a recent upload to the Ohio Secretary of State website reveals that Quality Light Source LLC was formed in Cleveland, Ohio on February 7, 2017, by ACFB Inc.

68.     The registered agent for ACFB Inc. is Ira Kaplan, Defendant Yan's long-time personal attorney, and the Executive Chairman of Benesch, Friedlander, Coplan & Aronoff LLP ("Benesch").  ACFB Inc., Benesch, and Quality Light Source LLC are all registered at the same Cleveland address.

69.     The QLS web domain, qlightsource.com was registered in November 2016, by a registrar company, Hichina Zhicheng Technology Ltd., connected to the Chinese company Alibaba.

70.     Plaintiffs have also learned that QLS is affiliated with one of TCP's vendors, Zhenjiang QiangLing Energy-Saving Light Source Co Ltd (镇江弸凌节能光源有限公司) ("ZJ Qiangling"), which is wholly owned by Solomon Yan and supervised by Sui Naiqing (眭乃清), a former TCP employee.

71.     ZJ Qiangling's Chinese name – 镇江弸凌节能光源有限公司— contains characters that are translatable to "Quality Light Source."  "QiangLing" (弸凌), a combination of the Yan brothers' given names, can also be translated as "quality," while the characters 光源 can be translated as "light source."  Alternatively, the "Q" from the name can be combined with the first letters of "light source" to create the acronym "QLS."

72.     In October 2016, ZJ Qiangling changed its business activities registered with the Administration of Industry and Commerce in the People's Republic of China to include import and export, and in January 2017, ZJ Qiangling changed its registered activities again to include production activities.

73.     ZJ Qiangling also posted several job openings in January and February 2017, including positions for assembly line workers, a clerk for manufacturing, a merchandiser, a human resources employee, and an administrative clerk.[4]

### E.      TCP Learns that QLS Is Passing Off TCP Products As Its Own

74.     Plaintiffs also discovered that QLS is not only passing off TCP's manufacturing capabilities, infrastructure, and product offerings as its own, but is also passing off TCP's physical products as its own.

75.     Concerned by its initial investigative findings, TCP reached out to Customer A to see if it could learn more about Defendant Du's visit and any subsequent contact with Customer A. During that conversation, TCP learned that Du had provided Customer A with a number of sample bulbs, which Du stated were a "flavor" of the products that QLS could provide.

76.     An employee of Customer A delivered the sample bulbs to a TCP employee, who brought the samples into TCP's Aurora, Ohio headquarters to examine.

77.     When TCP engineers opened one of the sample bulbs, they discovered that the components of the bulb were identical to one of TCP's bulbs, down to the unique circuitry of the driver board and the product identification number, both of which are unique to TCP.

---

[4]     http://www.0511rc.com/company/company-jobs-3606-1.htm
        http://www.0511rc.com/simple/simplelist.php?key=%D5%F2%BD%AD%C7%B

TCP Product                                    QLS Sample







79.     As the bottom pictures show, TCP utilizes a unique lettering sequence for each of its engineering designs that starts with the letters "JXL."  These are the initials of one of TCP's first engineers in the 1990s.  This is not an industry term, and no other company uses that same nomenclature.

80.     The only difference TCP's engineers could discern between the bulb provided by QLS and the TCP bulb was that the bulb provided by QLS did not have "TCP Sample Product" stamped on it.

81.     Plaintiffs have also discovered that Defendant Yan has been actively soliciting TCP employees to join QLS, calling it "Solomon's company" that Defendant Yan will be joining in July 2017, and has in fact caused others to terminate their employment with TCP.

82.     For example, in late February, Defendant Jose Ortiz, a longstanding salesman who had worked for TCP for over 20 years, provided TCP with a notice of resignation, effective March 10.

83.     During the time Ortiz worked at TCP, he spent the vast majority of his time cultivating relationships with TCP's key customers and prospects.  Ortiz also had access to some of TCP's most confidential and proprietary business information, including its current and prospective customer lists, its pricing strategies, and its required margins.

84.     Ortiz managed TCP's nationwide utility sales channel, marketing TCP's products to high-volume customers that sell into utility markets that offer specials for energy-efficient products.

85.     Ortiz initially denied that he would be joining Defendant Yan.  But on or around March 9, 2017, Ellis Yan's friend Wei Ying Sui (whom he had previously asked to deliver messages to employees for him) notified another former TCP employee that TCP's top U.S. salesman (Ortiz) had quit TCP and was going to work for Ellis Yan.  In the same conversation, Ms. Sui said that Ellis Yan would be recruiting others from TCP to work for him as well.

86.     Jose Ortiz's Linkedin profile now lists his employment as Director of Sales, Utility Channel at QLS.  This title indicates that QLS hired Ortiz to perform the same job as he had at TCP.

87.     Importantly, Ortiz has a valid and binding non-compete in his employment agreement with TCP, Inc., which prohibits him for a period of one-year following a voluntary

separation from TCP, Inc., from competing with TCP, Inc. "relating to the sale of energy

efficient lighting." (*See* Conditions of Employment Agreement, attached as Exhibit C.)

88. Upon information and belief, Defendant Yan and QLS had knowledge of Ortiz's

Employment Agreement and the non-compete clause contained therein prior to hiring him, but

determined to hire Ortiz in any event.

89. TCP has also received a resignation from a key Chinese engineer who had been

with the company for almost 20 years and was very involved in the development of products.

90. Upon information and belief, Defendant Yan has also contacted, or caused others,

including QLS, Du, and his brother Solomon, to contact, a number of current and prospective

TCP customers in order to start competing with TCP.

91. In addition to Customer A, on or around February 15, 2017, for example, TCP

learned that Solomon Yan had reached out to the primary buyer at a large TCP customer in the

United States to notify him that Solomon had resigned from TCP, and that he was starting a new

company and wanted to establish a business relationship with him. Solomon Yan also told him

that Ellis would be contacting him.

92. The confusion caused by this contact and other similar communications could

cause customers to be wary of transacting business with TCP—a Company whose own majority

shareholders are intentionally undercutting its business prospects.

93. TCP has also learned that on March 2, 2017, Defendant Du and Solomon Yan

took two senior managers from Company A on a tour of a manufacturing facility in China. TCP

has been unable to confirm whether the tour was of a TCP facility or of ZJ Qiangling, or whether

Du represented that the tour was in any way associated with TCP.

94.     Taken together, these facts demonstrate that Defendant Ellis Yan, acting on his own, and through, and in concert with Solomon Yan, Shawn Du, and QLS, has engaged in unfair competition with TCP and committed deceptive trade practices in violation of various federal and state laws.  If Defendants' actions are not stopped immediately, TCP will suffer irreparable harm, including loss of goodwill, reputation harm, and the potential loss of customers, and the public will continue to be deceived by QLS's representations and alleged product offerings.

**F.     Defendant Yan's Breach of His Executive Employment Agreement**

95.     Through this action, Plaintiffs also seek a temporary restraining order and preliminary injunctive relief in aid of arbitration to prevent Defendant Yan from violating the terms of a July 1, 2012 Executive Employment Agreement between Defendant Yan and TCP, Inc. (the "Employment Agreement.")  A true and correct copy of the Employment Agreement is attached as Exhibit D.

96.     As CEO, Defendant Yan had unfettered access to TCP's confidential and proprietary information, its pricing methodology and margins, customer information, and strategic business goals and objectives. Yan also regularly maintained contact with TCP's key customers and prospects, as well as its suppliers.

97.     Defendant Yan's Employment Agreement set forth the terms and conditions for his employment as CEO.  In recognition of Yan's access to TCP's proprietary and trade secret information, Yan's Employment Agreement contains certain restrictive covenants that the parties agreed were essential to protect the business and goodwill of TCP.  Defendant Yan agreed that, as part of the consideration for the compensation and benefits to be paid thereunder, during the term of the Employment Agreement and for a period of two years thereafter, Yan would not:

(i)     Own, manage, control or participate in the ownership, management or control of, or be employed or engaged by or otherwise affiliated or associated as a consultant, independent contractor or otherwise with, any other corporation,

limited liability company, partnership, proprietorship, firm, association or other business entity, or otherwise engage in any business that is engaged in any manner in, or otherwise competes with, the business of TCP or any of TCP International's affiliates or subsidiaries . . . ;

(ii)     Approach, solicit or otherwise transact any business in any manner pertaining to suppliers . . . or customers of TCP or any of its subsidiaries or affiliates, or take any action to cause such suppliers or customers to not transact business in any manner with TCP or any of its subsidiaries or affiliates, which, in any manner, would have, or is likely to have, an adverse effect upon TCP or any of its subsidiaries or affiliates; and

(iii)    Induce any employee of TCP or any of its subsidiaries or affiliates, or suppliers or agents of TCP or any of its subsidiaries or affiliates to terminate his or her employment with TCP or any of its subsidiaries, affiliates or suppliers, or hire or assist in the hiring of any such employee by any person or entity not affiliated with TCP.

(Employment Agreement at Section 5.)

98.     Defendant Yan also agreed to a confidentiality clause, which requires him to permanently maintain as secret and confidential all valuable and unique information that gives TCP and its subsidiaries or affiliates a competitive advantage in the industry, and restricts Defendant Yan from using that confidential information outside the scope of his employment with TCP.  (Agreement at Section 6.)  The Employment Agreement defines "confidential information" as including, but not limited to, "technical knowledge, know-how or trade secrets and information concerning the operations, sales, personnel, suppliers, customers, costs, profits, markets, [and] pricing policies." (*Id.*)

99.     Defendant Yan further agreed that "all know-how, documents, reports, plans, proposals, marketing and sales plans, client lists, client files and materials made by [Yan] or by TCP, TCP International and their subsidiaries . . . are the property of TCP, TCP International and their subsidiaries and [could] not be used by [Yan] in any way adverse to the interests of TCP and its subsidiaries or affiliates." (*Id*.)  Yan specifically agreed that he would not deliver,

25

reproduce or in any way allow proprietary TCP documents or things to be delivered or used by any third party without specific direction or consent of the Board.  (*Id.*)

100.    Defendant Yan recognized the importance of these restrictions given his unique talents and employment as CEO and agreed that TCP would suffer irreparable damage if he did not strictly honor the restrictive covenants or confidentiality restrictions.  Yan expressly agreed that the remedy at law for any breach of his commitments would be inadequate and that TCP would be entitled, among other remedies, to immediate injunctive relief and a temporary restraining order restraining any threatened or further breach. (Agreement at Section 9(b).)

101.    Plaintiffs are filing a separate action for breach of contract and to permanently enforce the terms of this Agreement through AAA arbitration, as required under the terms of the Agreement.

102.    Through this action, Plaintiffs seek a temporary restraining order and preliminary injunctive relief pending the appointment of an arbitrator under AAA rules and the ability to obtain relief through that forum.

103.    The Federal Arbitration Act, 9 U.S.C. § 3, and controlling case law allow a party to obtain the requested injunctive relief in cases such as this where the withholding of injunctive relief would render the process of arbitration meaningless.  Here, by the time Plaintiffs could obtain injunctive relief through arbitration, they could not be returned substantially to the status quo ante.

## COUNT I

**FEDERAL UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN
SECTION 43(a) OF THE LANHAM ACT, 15 U.S.C. § 1125(a)(1)(A)
AGAINST DEFENDANTS YAN, DU, AND QLS**

104.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten herein.

105.    Defendants Yan, Du, and QLS have deliberately and willfully made false representations of fact in interstate commerce by representing in marketing materials and otherwise that QLS has the same long-standing experience in the industry as TCP, the same established infrastructure, including manufacturing facilities and certified laboratories and accreditations, and the same product offerings.

106.    Defendants Yan, Du, and QLS have also deliberately and willfully passed off in interstate commerce TCP's actual products as QLS sample products.

107.    The actions of Defendants Yan, Du, and QLS have caused and are likely to continue to cause consumer confusion, mistake, or deception as to the affiliation of QLS to TCP and the origin of products offered by QLS, in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

108.    The deception resulting from the actions of Defendants Yan, Du, and QLS is material because it is likely to influence the purchasing decisions of TCP's customers and prospective customers and the consumer market in large.

109.    Defendants Yan, Du, and QLS had direct and full knowledge of TCP's ownership interests and rights in its proprietary information and products before the acts complained of herein occurred. The knowing, intentional, and willful nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117(a).

110.    The wrongful acts of Defendants Yan, Du, and QLS have proximately caused and will continue to cause TCP substantial injury, including diversion of sales, loss of customers, dilution of its goodwill, confusion of potential customers, injury to its reputation, and diminution in value of its products, confidential information, and other proprietary data. These actions will cause imminent and irreparable harm and injury to TCP, the amount of which will be difficult to ascertain, if they continue.

111.    TCP is entitled to a temporary restraining order and preliminary and permanent injunctive relief restraining Defendants Yan, Du, and QLS, their affiliates, officers, agents, employees, assigns, and all persons acting in concert with them from engaging in further unfair, unlawful, and fraudulent conduct.

112.    TCP is also entitled to recover from Defendants Yan, Du, and QLS the monetary damages sustained by TCP as a result of the wrongful acts committed by Defendants Yan, Du, and QLS, as well as any gains, profits, and advantages obtained by these Defendants. The amount of such damages, gains, profits, and advantages cannot be determined at this time, but will be proved at trial.

113.    TCP is further entitled to costs of this action and recovery of its reasonable attorneys' fees as a result of the bad faith and willful conduct of Defendants Yan, Du, and QLS.

## COUNT II

### OHIO DECEPTIVE TRADE PRACTICES ACT
### OHIO REV. CODE §§ 4165.01 *et seq.*
### AGAINST DEFENDANTS YAN, DU, AND QLS

114.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten herein.

115.    Defendants Yan, Du, and QLS have deliberately and willfully made false representations of fact in interstate commerce by representing in marketing materials and

28

otherwise that QLS has the same long-standing experience in the industry as TCP, the same established infrastructure, including manufacturing facilities and certified laboratories and accreditations, and the same product offerings.

116.    Defendants Yan, Du, and QLS have also deliberately and willfully passed off in interstate commerce TCP's actual products as QLS samples.

117.    The actions of Defendants Yan, Du, and QLS have caused and are likely to continue to cause consumer confusion, mistake, or deception as to the affiliation of QLS to TCP and the origin of products offered by QLS, in violation of Ohio Rev. Code §§ 4165.02(1), (2), and (3).

118.    The deception resulting from the actions of Defendants Yan, Du, and QLS is material because it is likely to influence the purchasing decisions of TCP's customers and prospective customers and the consumer market in large.

119.    These wrongful acts of Defendants Yan, Du, and QLS have proximately caused and will continue to cause TCP substantial injury, including diversion of sales, loss of customers, dilution of its goodwill, confusion of potential customers, injury to its reputation, and diminution in value of its products, confidential information, and other proprietary data. These actions will cause imminent and irreparable harm and injury to TCP, the amount of which will be difficult to ascertain, if they continue.

120.    TCP is entitled to a temporary restraining order and preliminary and permanent injunctive relief under Ohio Rev. Code § 4165.03(A)(1) restraining Defendants Yan, Du, and QLS, their affiliates, officers, agents, employees, assigns, and all persons acting in concert with them from engaging in further deceptive, unlawful and fraudulent conduct.

121.     Pursuant to Ohio Rev. Code § 4165.03(A)(2), Plaintiffs are further entitled to recover from Defendants Yan, Du, and QLS the monetary damages sustained by Plaintiffs as a result of the wrongful acts committed by Defendants Yan, Du, and QLS in violation of Ohio Rev. Code § 4165.02(A), in an amount to be proved at trial.

122.     Under Ohio Rev. Code § 4165.03(B), Plaintiffs are also entitled to recover their reasonable attorneys' fees in connection with this action as a result of the knowing, intentional and willful nature of the acts set forth herein.  Defendants Yan, Du, and QLS had direct and full knowledge of TCP's ownership interests and rights in its proprietary information and products before the acts complained of herein occurred.

## COUNT III

### COMMON LAW UNFAIR COMPETITION
### AGAINST DEFENDANTS YAN, DU, AND QLS

123.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten herein.

124.     By their conduct described above, Defendants Yan, Du, and QLS have created a likelihood of consumer confusion between TCP's product offerings, infrastructure, manufacturing capabilities, and products themselves and those of QLS.

125.     Defendants Yan, Du, and QLS have, personally and through agents, distributed marketing materials purportedly showing QLS's product offerings, infrastructure, and manufacturing capabilities, but in reality showing TCP's product offerings, infrastructure, and manufacturing capabilities.

126.     Defendants Yan, Du, and QLS have, personally and through agents, provided sample QLS light bulbs that are in actuality TCP light bulbs that contain proprietary TCP components.

127.    Defendants Yan, Du, and QLS have also, personally and through agents, deliberately, willfully, and falsely represented that they are affiliated, associated, or connected to TCP in order to unfairly compete with TCP and to confuse consumers as to the relationship between QLS and TCP.

128.    The actions of Defendants Yan, Du, and QLS have caused and are likely to continue to cause consumer confusion or mistake and to deceive customers as to QLS's association with TCP and the origin of QLS's products.

129.    These wrongful acts have proximately caused and will continue to cause TCP substantial injury, including diversion of sales, loss of customers, dilution of its goodwill, confusion of potential customers, injury to its reputation, and diminution in value of its products, confidential information, and other proprietary data.  These actions will cause imminent and irreparable harm and injury to TCP, the amount of which will be difficult to ascertain, if they continue.

130.    TCP is thus entitled to a temporary restraining order and preliminary and permanent injunctive relief restraining Defendants Yan, Du, and QLS, their affiliates, officers, agents, employees, assigns and all persons acting in concert with them from engaging in further unfair, unlawful and fraudulent conduct.

131.    TCP is also entitled to compensatory damages, in an amount to be proved at trial.

## COUNT IV

**EMERGENCY INJUNCTIVE RELIEF**
**BASED ON DEFENDANT ELLIS YAN'S BREACH OF CONTRACT**

132.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten herein.

133.   The Employment Agreement and its restrictive covenants regarding non-competition, non-solicitation, and confidentiality are valid and enforceable in all respects.

134.   TCP Inc. has fully performed every obligation it owes to Defendant Yan under the Employment Agreement.

135.   As set forth in the Employment Agreement, Ellis Yan agreed that, for two years after termination or non-renewal of the agreement, he would not "[o]wn, manage, control or participate in the ownership, management or control of, or be employed or engaged by or otherwise affiliated or associated as a consultant, independent contractor or otherwise with, any other corporation, limited liability company, partnership, proprietorship, firm, association or other business entity, or otherwise engage in any business that is engaged in any manner in, or otherwise competes with, the business of TCP or any of TCP International's affiliates or subsidiaries." (Employment Agreement at 5(a)(i).)

136.   Upon information and belief, Ellis Yan has violated and continues to violate this non-compete provision by, among other things, associating with QLS and participating in the formation of QLS, a company directly competing with TCP.

137.   Ellis Yan also agreed that he would not, "[a]pproach, solicit or otherwise transact any business in any manner pertaining to suppliers (except professional tax and accounting firms and other business consulting firms which may be vendors of TCP) or customers of TCP or any of its subsidiaries or affiliates, or take any action to cause such suppliers or customers to not transact business in any manner with TCP or any of its subsidiaries or affiliates, which, in any manner, would have, or is likely to have, an adverse effect upon TCP or any of its subsidiaries or affiliates." (Employment Agreement at 5(a)(ii).)

138.    Upon information and belief, Ellis Yan has violated and continues to violate this non-solicitation provision by, among other things, reaching out to TCP's customers, both personally and through agents, in order to directly damage TCP's position with those customers or otherwise compete with TCP.

139.    Ellis Yan also agreed not to "[i]nduce any employee of TCP or any of its subsidiaries or affiliates, or suppliers or agents of TCP or any of its subsidiaries or affiliates to terminate his or her employment with TCP or any of its subsidiaries, affiliates or suppliers, or hire or assist in the hiring of any such employee by any person or entity not affiliated with TCP." (Employment Agreement at 5(a)(iii).)

140.    Upon information and belief, Ellis Yan has violated this non-solicitation provision by, among other things, inducing, either personally or through his agents, TCP employees, including Jose Ortiz and others, to leave TCP and work for QLS (and Ellis Yan).

141.    Ellis Yan also agreed "not to disclose [TCP] Confidential Information to anyone outside TCP, and not to use the Confidential Information other than for the performance of [his] duties [t]hereunder, either during or after the employment by TCP, except as authorized by TCP in connection with performance of the duties set forth in this Agreement, or other duties assigned by TCP or TCP International from time to time." (Employment Agreement at 6(a).)

142.    Upon information and belief, Ellis Yan has violated this confidentiality provision by, among other things, providing Confidential Information, as defined in the Employment Agreement, to Shawn Du and others at QLS in order to unfairly compete with TCP.

143.    In conjunction with this Complaint, Plaintiffs are also filing a related arbitration action against Defendant Ellis Yan for violation of his Employment Agreement, a dispute that is subject to mandatory arbitration.

144.    Through this action, Plaintiffs seek a temporary restraining order and grant of preliminary injunctive relief pending arbitration and to maintain the status quo until an arbitrator is appointed and Plaintiffs are able to obtain relief through that forum.

145.    Unless he is immediately restrained, Ellis Yan will continue to breach the Employment Agreement, causing continuing and irreparable injury to TCP's business and goodwill, diminishment of TCP's competitive standing, and the potential loss of customers.

146.    TCP has no adequate remedy at law for the immediate and irreparable harm it will suffer to its business operations, business goodwill, and customer relationships.

147.    Plaintiffs are therefore entitled to a temporary restraining order and preliminary injunction restraining Ellis Yan from breaching the non-competition, non-solicitation, and confidentiality provisions in the Employment Agreement, through his own acts or through the acts of his agents.

## COUNT V

### BREACH OF CONTRACT AGAINST DEFENDANT ORTIZ

148.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten herein.

149.    On August 18, 2005, Defendant Ortiz entered into a Conditions of Employment Agreement with TCP, Inc. (the "Ortiz Agreement"), which set forth certain terms and conditions of his employment as a TCP salesman.

150.    The Ortiz Agreement contains a non-competition provision, which provides that "during the one year period commencing on the date of your separation from [TCP Inc.'s] employ, you will not, without prior written consent of [TCP Inc.], compete with [TCP Inc.] relating to the sale of energy efficient lighting products."  (Exhibit C, at ¶ 5.)

151.    TCP required Defendant Ortiz to agree to this non-competition clause as a condition of employment in light of the sales role that Defendant Ortiz held. Ortiz spent the vast majority of his time cultivating relationships with TCP's key customers and prospects.  Ortiz also had access to some of TCP's most confidential and proprietary business information, including its current and prospective customer lists, its pricing strategies, and its required margins.  Ortiz managed TCP's nationwide utility sales channel, marketing TCP's products to high-volume customers that sell into utility markets that offer specials for energy-efficient products.

152.    Defendant Ortiz agreed to this non-competition provision in consideration of and as part of the terms of his employment and in consideration of the salary paid to him by TCP. (Exhibit C, at intro C, Introduction paragraph)

153.    Defendant Ortiz's non-competition agreement is valid and enforceable in all respects.

154.    TCP Inc. has fully performed every obligation owed to Defendant Ortiz under the Ortiz Agreement.

155.    Defendant Ortiz provided TCP with a notice of resignation in late February 2017, effective March 10, 2017.

156.    Upon information and belief, Defendant Ortiz has now accepted employment with QLS, a company directly competing with TCP in the energy efficient lighting industry. Defendant Ortiz's Linkedin profile states that Ortiz is employed as the Director of Sales, Utility Channel at QLS.

157.    By accepting employment with QLS, Defendant Ortiz has breached the non-competition provision in the Ortiz Agreement.

158. Unless restrained, Defendant Ortiz will continue to breach the Ortiz Agreement, causing continuing and irreparable injury to TCP's business and goodwill, diminishment of TCP's competitive standing, and the potential loss of customers.

159. TCP has no adequate remedy at law for the immediate and irreparable harm it will suffer to its business operations, business goodwill, and customer relationships.

160. Plaintiffs are therefore entitled to a temporary restraining order and preliminary injunction restraining Defendant Ortiz from working for QLS in breach of the non-competition provision in the Ortiz Agreement.

## COUNT VI

### TORTIOUS INTERFERENCE AGAINST DEFENDANTS YAN AND QLS

161. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint as if fully rewritten herein.

162. The Ortiz Agreement and its non-competition provision are valid and enforceable in all respects.

163. Defendant Yan was the CEO of TCP, Inc. at the time that Ortiz entered into the Ortiz Agreement and has knowledge of the existence and terms of the Ortiz Agreement and the obligations of Defendant Ortiz thereunder, including his obligations under the non-competition provision.

164. Upon information and belief, Defendant QLS also has knowledge of the existence and terms of the Ortiz Agreement and the obligations of Defendant Ortiz under the Agreement, including his obligations under the non-competition provision.

165. Upon information and belief, Defendant Yan recruited Defendant Ortiz and caused QLS to hire Ortiz despite that both Yan and QLS had knowledge that Ortiz's hiring

would violate the Ortiz Agreement's non-competition provision. Defendants QLS and Yan did so in order to help QLS compete with TCP in the energy efficiency lighting industry.

166.    By employing Defendant Ortiz in knowing violation of his obligations to TCP under the Ortiz Agreement, Defendants QLS and Yan have tortiously interfered with TCP's contractual relations in violation of Ohio common law.

167.    TCP has suffered damages as a result of QLS's and Yan's tortious interference with TCP's contractual rights under the Ortiz Agreement and seeks to recover compensatory damages in an amount to be established at trial.

168.    TCP also seeks an award of punitive damages because Defendants QLS and Yan acted with malice in committing the acts described  herein.

## JURY DEMAND

169.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs request a jury trial of all issues that may be tried to a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Enjoining, preliminarily and permanently, Ellis Yan, Shawn Du, and QLS, and anyone acting on their behalf, in association or affiliation with them, or in concert with them, including, but not limited to Zhenjiang QiangLing Energy-Saving Light Source Co Ltd, from engaging in unlawful acts of unfair competition, including by:

(i)    Passing off, or inducing or enabling others to sell or pass off, any TCP products as QLS products, including sample products;

(ii)    Passing off, or inducing or enabling others to pass off, TCP's marketing materials or other information, including, but not limited to its infrastructure, manufacturing facilities, and product offerings as related to QLS or any other lighting company;

      (iii)     Selling, advertising, using, transferring, and/or shipping, directly or indirectly, any TCP products or services, including, but not limited to, TCP lightbulbs;

      (iv)     Committing any acts calculated to cause customers to believe that Defendant QLS is in any way affiliated with, associated with, or connected to TCP;

      (v)     Committing any other acts that could cause customer or consumer confusion regarding the source or origin of QLS's products or services;

B. Requiring all Defendants, and anyone acting on their behalf, in association with them, or in concert with them, to immediately return to TCP each and every original, copy, or other reproduction of any piece of TCP proprietary business information and all TCP products in their possession, custody and control;

C. Enjoining, preliminarily, Ellis Yan from violating his Employment Agreement, including its non-compete, non-solicitation, and confidentiality provisions, directly or through his agents, including Defendants Shawn Du and QLS, pending resolution of the related arbitration action to be brought under AAA rules;

D. Enjoining, preliminarily and permanently, Jose Ortiz from violating the non-competition provision in his Conditions of Employment Agreement, including by associating with Defendant QLS;

E. Awarding Plaintiffs monetary damages and punitive damages, where applicable, in an amount to be proved at trial;

F. Awarding Plaintiffs all costs of Court and reasonable attorneys' fees and expenses incurred herein.

G. Awarding any and all such further legal or equitable relief that this Court may deem appropriate.

Dated: March 21, 2017

/s/ Charles F. Smith
Charles F. Smith, *pro hac vice pending*
charles.smith@skadden.com
Marcella L. Lape, *pro hac vice pending*
marcella.lape@skadden.com
Gail E. Lee, *pro hac vice pending*
gail.lee@skadden.com
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
155 North Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 407-0700

/s/ Daniel R. Warren
Daniel R. Warren (#0054595)
dwarren@bakerlaw.com
BAKER & HOSTETLER LLP
Key Tower
127 Public Square
Cleveland, OH 44114
(216) 861-7145

*Attorneys for Plaintiffs TCP International*
*Holdings, Ltd. and Technical Consumer*
*Products, Inc.*

## **VERIFICATION**

STATE OF OHIO

COUNTY OF CUYAHOGA

        Brian Catlett, being duly sworn, deposes and states:

        I am the Chief Executive Officer of TCP International Holdings, Ltd. ("TCPI")
and Technical Consumer Products, Inc.  I have read the foregoing Verified Complaint and the
statements and claims made therein are true and correct to the best of my knowledge,
information, and belief.  I make this verification based upon my own personal knowledge of the
facts as alleged in the Verified Complaint, and where I do not have personal knowledge, after a
reasonable investigation and information or knowledge sufficient to form a belief that they are
true.

        Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury that the foregoing
is true and correct.

        Executed on 3/21/17

        /s/ Brian Catlett

        Brian Catlett